STATE OF MAINE                       BUSINESS & CONSUMER COURT
CUMBERLAND COUNTY           Dkt. No. BCD-CV-2017-56

REBECCA W. BELANGER[1]       )
plaintiff,                          )
                                )       FINAL JUDGMENT
     v.                        )       14 M.R.S. §2401
                                )
LISA M. YORKE               )
defendant                   )

The Court hereby enters final judgment in this action based on a November 1, 2018 Combined Order on Cross-Motions for Partial Summary Judgment ("2018 Order") and a November 18, 2021 Order Following Bench Trial ("2021 Order").

Lisa M. Yorke owns the West Bath, Cumberland County, Maine real estate described in the June 20, 2005 deed from Bradford P. Belanger, Jr. to Lisa M. Yorke that was recorded in Book 2016R, Page 4766 of the Sagadahoc County Registry of Deeds on July 15, 2006 ("2005 Deed"). (2021 Order)

The 2005 Deed has an adequate legal description and 33 M.R.S. §480 is not an affirmative defense to Lisa's claim of ownership. (2018 Order and 2020 ME 24)

The June 27, 2016 deed from Bradford P. Belanger, Jr. to Bradford P. Belanger, Jr. and Rebecca Williams Belanger recorded in Book 2016, Page 4333 on June 27, 2006 ("2016 Deed") did not affect Lisa's title to her West Bath real estate described in the 2005 Deed because: (1) the 2016 Deed was not supported by consideration and Rebecca Williams was not protected by the Maine Recording Act; (2) Rebecca Williams had

---

[1] Rebecca Williams Belanger is now known as Rebecca Williams.

implied actual notice of the 2005 Deed and she was not protected by the Maine Recording Act; and (3) Bradford P. Belanger, Jr. signed the 2016 Deed as a result of Rebecca Williams' undue influence and abuse of confidential relationship and it must be avoided. (2021 Order)

The Court adds the following provisions to the judgment in accordance with 14 M.R.S. §2401:

A.  The names and addresses of the parties to this action and their attorneys are:

Rebecca Williams Belanger, now known as Rebecca Williams
11 Ash Street
Gardiner, Maine 04345

Christopher E. Pazar, Bar No. 3037
Drummond & Drummond, LLP
One Monument Way
Portland, Maine 04101

Lisa M. Yorke
22 Pine Hill Road South
Cape Neddick, Maine 03902

Chris Neagle, Bar No. 1074
Neagle Law LLC
76 Orchard Road
Cumberland, Maine 04021

B.  The case was initially filed in the Sagadahoc County Superior Court as Docket No. CV-17-15 and was transferred to the Business and Consumer Docket at Portland on November 29, 2017, Docket No. BCD-CV-2017-56.

C.  Both parties have received notice of the proceeding in accordance with applicable provisions of the Maine Rules of Civil Procedure.

D. The real estate involved can be described as follows: certain lot or parcel of land, with all buildings and improvements on it, located in West Bath, Sagadahoc County, Maine, shown as **Lot 5** on a plan of Winnegance Shores, drawn by J. Albert Redlon, August, 1926, Section #1, recorded in the Sagadahoc County Registry of Deeds in **Plan Book 3, Page 15**.

This Final Judgment was presented to the court after the 2021 Order became final. Defendant Lisa M. Yorke shall be responsible for preparing this Final Judgment and shall be responsible for recording an attested copy of this Final Judgment in the Sagadahoc County Registry of Deeds.

**12/29/2021**
_____

_____
Honorable Michael Duddy
Judge, Business and Consumer Docket

Incorporated by reference on the docket at the specific direction of the court. Entered on the docket: 12/29/2021

Clerk's Certification

_____, 202\_

The 2018 Order was entered after remand following appeal and the applicable appeal period for the 2020 Order has expired without action.

_____
Clerk, Business and Consumer Court

_____
type or print name

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER COURT
DOCKET NO. BCD-CV-2017-00056

REBECCA BELANGER,

　　　　Plaintiff,

v.

LISA YORKE,

　　　　Defendant.

)
)
)
)
)
)
)
)
)
)
)

**ORDER FOLLOWING BENCH TRIAL**

INTRODUCTION

This case centers on the ownership of a family camp located on the shore of Brigham's Cove in West Bath, Maine. On remand, the Court must determine whether Plaintiff is a bona fide purchaser of the camp, a question which hinges on whether a 1977 agreement between spouses to exchange real estate was supported by consideration. The case was tried to the Bench on October 6 and 7, 2021. Rebecca Belanger, née Williams ("Becky"), and Lisa Yorke ("Lisa") each testified, as did witnesses Michael Yorke, Matthew Belanger, John Voorhees, and Hillary Belanger Ware. The parties submitted post-trial briefs on October 20, 2021. For the reasons discussed below, the Court determines that the 1977 agreement was not supported by consideration; that Becky is not a bona fide purchaser of the camp; and that Lisa owns the camp. Accordingly, the Court grants judgment in favor of Lisa.

FINDINGS OF FACT

The Court has carefully weighed the credibility of the parties and witnesses, who often provided conflicting testimony, and has thoroughly considered their ability to recall events. The Court observed and assessed the demeanor of the parties and witnesses at all points of the trial, including both during testimony and in reaction to the testimony of others. Based on the evidence

1

adduced at trial and all reasonable inferences drawn therefrom, and resolving all inconsistencies and conflicts, the Court makes the following findings of fact by a preponderance of the evidence.

In 1977, Bradford P. Belanger, Jr. ("Brad") married Plaintiff, then Rebecca Williams. It was the second marriage of both, and both had a child from their previous marriages. The Defendant, Lisa, is Brad's daughter by his first wife, Louise. Hillary Belanger Ware, who testified on behalf of Becky, is Becky's adopted daughter. Matthew Belanger, who also testified on behalf of Becky, was adopted by both Becky and Brad after they had married.

In 1976, before his marriage to Becky, Brad received from his parents the deed to the Belanger family camp, located on the shore of Brigham's Cove at 22 Bruce Byway in West Bath, Maine (the "Camp"). The Camp is a small, cove-side parcel with a red cottage, wooden dock, and wooden wharf. Brad's parents had bought the Camp in the early 1950s and the family used the property extensively for recreational purposes when the season permitted. Becky owned property on Prospect Street in Bath, Maine (the "Prospect Street Property"). In 1977, shortly after their marriage, Becky and Brad made an informal, unwritten agreement to put each other's names on these two separately owned properties as joint tenants (the "1977 Agreement").

The 1977 Agreement was exclusively entered into as a ceremonial exchange of gifts, not a quid pro quo for mutual promises. For her part, Becky intended the 1977 Agreement to represent the fact that she and Brad were now a married couple sharing a life together. For Becky, the 1977 Agreement served a similar purpose as did adopting a child with Brad—it symbolized their new life together. In essence it had nothing to do with real estate, or a bargained for exchange of reciprocal promises regarding property interests, but rather signifying the start of a shared life.

For his part, Brad entered the 1977 Agreement purely out of marital obligation and social propriety, and to appease his new wife. In fact, Brad never intended to make Becky a joint tenant

on the deed for the Camp, in 1977 or thereafter. Brad had received the Camp as a gift from his parents, and he was concerned that his parents would be upset if he added Becky to the deed. Brad always intended to give the Camp to Lisa. Having his name added to Becky's Prospect Street Property was unimportant to him, and not worth bargaining for in exchange for joint tenancy of the Camp.

In 1978, Becky conveyed her Prospect Street Property to herself and Brad as joint tenants. Becky and Brad signed and filed, under penalties for false declaration of value, a Real Estate Transfer Tax Declaration ("RETTD") for the Prospect Street Property. The RETTD was prepared by an attorney representing both Becky and Brad. Section 8 of the RETTD is entitled "Consideration" and requires the parties to disclose the amount of the consideration provided for the transfer. The instructions for Section 8 are shown on the RETTD form and state, in relevant part, as follows: "Consideration meaning the total amount or price paid, or required to be paid, for real property valued in money, whether received in money or otherwise. . . ." Becky and Brad entered $0.00 in Section 8 as the consideration provided for the transfer.

Section 10 of the same RETTD form is entitled "Special Circumstances." It asks the parties: "Were there special circumstances in the transfer which suggest that the sale price of the property was either more or less than its fair market value (Such as the fact that the transfer was a forced sale, interfamily sale, intercorporate sale, gift, exchange, etc.)." Becky and Brad checked the box for "Yes." For Becky, the transfer demonstrated that they were a couple; she didn't gain anything out of it.

Despite the 1977 Agreement and despite Becky having added Brad to the Prospect Street Property as a joint tenant, Brad did not convey the camp to Becky and himself as joint tenants in 1978. Brad suggested, and Becky readily agreed, that transfer of the Camp into joint tenancy would

3

be delayed until the death of both of Brad's parents. Brad's father died in 1984 and his mother died in 1989. Even after their deaths, however, Brad still did not transfer the Camp into joint tenancy with Becky and himself and Becky did not pressure or ask him to do so.

Brad's daughter Lisa married her husband Michael Yorke in the early 1980s and they began having children in 1984. Lisa's Aunt Annette owned the cottage to the south of the Camp (the "Grey Camp"), which now belongs to Lisa and Michael, and they also bought the plot to the north of the Camp in 2011 (the "Yorke Camp"). Lisa and Michael, along with family including Brad and Becky, Brad's parents, and Lisa's siblings, frequently visited the Camp during the spring, summer, and fall. Lisa feels a strong personal connection to the Camp. She spent her childhood weekends at the Camp and throughout the mid-1980s and onward she and Michael were the Camp's primary users. They brought their children and often stayed overnight. There was no need for anyone to "ask permission" to use the Camp; rather, Lisa called her father only to check if he or someone else was already planning on using it at a given time, as it is too small to accommodate multiple families. After Brad's mother died in 1989, he and Becky began visiting the Camp less often and no longer spent the night there. Lisa's siblings Hillary and Matthew continued to visit regularly until they were grown and moved away from the area. Hillary lived at the camp for a summer before moving away for a number of years, and Matthew spent approximately two months living there in the fall one year.

Years later, by deed dated June 5, 2005, Brad gave a deed to the Camp to Lisa (the "2005 Deed"). The 2005 Deed was Brad's idea, and he took the initiative to contact a lawyer and make it happen. In a letter accompanying the 2005 Deed, Brad wrote:

> I have always wanted you to have this property and look forward to seeing you enjoy this property during my lifetime. I do acknowledge that I have mentioned this property in the latest version of my Will and left it to my dear wife, Rebecca, but I have always intended it to go to you for you and your family. I intend for this to be

> an immediate transfer of this property, whether you decide to record it or not. I hope that you will enjoy this property as you always have and will have peace of mind that it is now yours.

The Court finds the sentiments expressed in the letter are authentic and reflect Brad's real desires.

Brad did not tell Becky about giving the 2005 Deed to Lisa. Becky was a domineering person, and Brad did not like to confront her. At times Brad was unhappy in the marriage. Lisa did not contemporaneously record the 2005 Deed because Brad did not want Becky to know about it at the time. Lisa also did not directly tell Becky about the 2005 Deed because she did not believe it was her place to do so. Further, Lisa was intimidated by and a little frightened of Becky.

However, Lisa and Michael made no secret of Lisa's ownership of the Camp. They told their friends, family, and neighbors—groups which frequently overlap in their close-knit community—about Lisa's new ownership. Michael openly discussed Lisa's ownership with clients at his business, where Lisa's stepbrother Matthew worked. Matthew overheard the comments and directly questioned Becky about the Camp's ownership based on what he heard at work. Lisa and Michael no longer checked in with Brad to see if the Camp was available. Brad and Becky rarely used the Camp at this point and other family members, such as Lisa's siblings, also ceased staying at the Camp. Michael began putting in significant sweat equity on behalf of himself and Lisa. Michael built a well-house between the Camp and the neighboring Grey Camp, and renovated the wharf over the course of 2011 to 2016. Michael explicitly claimed ownership of the Camp in Lisa's name when acquiring the permits necessary for the wharf from the West Bath Code Enforcement Officer in 2014. Michael's improvements to the Camp were apparent to any visitor, including Becky. Lisa and Michael paid the taxes and insurance by writing checks to Brad in the requisite amounts, and Michael moved into the Camp full-time in 2015. As the years went on and Becky's visits became less frequent, Lisa discarded clothes, pieces of furniture, and other

items Becky had stored at the Camp. Becky did visit the Camp on occasion between 2005 and Brad's death in 2016, and she observed the substantial renovations undertaken by Lisa and Michael. Becky also noticed that Lisa and Michael had discarded items Becky had left at the Camp.

By 2015, Brad was suffering from cancer. Becky acted as his primary caregiver, making all his appointments and generally overseeing his day-to-day life as necessary. As Brad's health declined, Becky became increasingly influential, and by 2016 Brad was fully dependent on her. In May of 2016, Becky contacted attorney John Voorhees, whom she personally knew and with whom she had previously worked. She told Voorhees that Brad was having serious medical problems, and that she needed a Power of Attorney right away. Brad's mental health was also deteriorating. Becky told Voorhees that they needed to tidy up some estate documents. Shortly after the phone call, Brad stopped by to sign the POA, which he and Becky took with them to a hospital in Boston.

Becky then set up a meeting with Voorhees to execute final estate documents. Becky never told Brad that she already knew Voorhees and that she had a prior working relationship with Voorhees. Voorhees did not have any discussions with Brad about the meeting or the documents to be signed. The meeting occurred on June 27, 2016, in Voorhees' office. In advance of the meeting, one of the documents Voorhees prepared was a deed transferring the Camp to Brad and Becky as joint tenants (the "2016 Deed"). Prior to the meeting, Voorhees did not discuss the Camp with Brad, or what Brad wanted to do with the Camp. The Camp was Brad's most significant asset. Voorhees, who had a personal connection with Becky, did not advise Brad, whose health was rapidly deteriorating and with whom he had no such personal connection, to consider independent counsel before executing this substantial transfer. Voorhees took his directions from Becky. For her part, Becky never mentioned the 1977 Agreement to Voorhees.

At the meeting on June 27, 2016, Voorhees and Becky presented Brad with several documents to sign, including the 2016 Deed. Voorhees explained the documents and went over the 2016 Deed with Brad and Becky. But Voorhees did not discuss the 2016 Deed with Brad outside of Becky's presence. He did not explain the tax consequences of transferring the Camp by deed as compared to a devise in Brad's will. Voorhees pointedly did not ask Brad if Lisa was left out of his will because she already had the Camp. Brad had no notice that he was going to be asked to sign the 2016 Deed. Brad had no desire to confront Becky over the Camp at this point, as he believed it had already been successfully transferred to Lisa in any case. With Becky and Voorhees looming over him, he signed the documents.

Two days later, on June 29, 2016 Voorhees had the 2016 Deed recorded in the Registry of Deeds. Becky and Brad also signed (under penalties for false declaration of value) and filed a RETTD prepared by Voorhees. Section 6 of the RETTD is entitled "Transfer Tax" and requires the parties to disclose the purchase price for the transfer. Section 6(a) states: "Purchase Price (If the transfer is a gift, enter "0"). The purchase price listed on the RETTD in 2016, just as that in 1978, was 0.00. In Section 9, which asks whether there are "special circumstances" around the transfer, neither the "Yes" nor "No" box are checked, though the following is written: "Transfer of property to husband and wife as joint tenants."

On July 15, 2016, having learned of the 2016 Deed, Lisa recorded the 2005 Deed in the Registry of Deeds along with the letter from Brad indicating he had always intended the Camp to be hers. On August 15, 2016, Brad signed an affidavit, developed by Lisa and Michael based on independent legal research, stating that he wished to rescind the 2016 Deed as he had been subjected to "undue influence" in its signing. Brad affirmed that "the only valid deed" to the Camp

was the 2005 Deed to Lisa and that that transfer was the only one he ever intended. The Court finds the affidavit expresses Brad's authentic sentiments and desires.

A week later, on August 21, 2016, Brad died. At the time of his death, he was 82 years old, and Becky was 67 years old. Lisa had no notice or knowledge of the 1977 Agreement until after Brad's death. After Brad died, Becky dropped the name Belanger, changed her surname back to Williams, and wouldn't let Lisa know where she lived. Becky wanted nothing to do with the family.

CONCLUSIONS OF LAW

Becky and Lisa each seek a declaratory judgment under 14 M.R.S. §§ 5951 et seq. that each respectively holds a valid fee title interest in the Camp and that the other holds no title interest in the Camp.[1] Since Becky recorded her deed first, the question presented is whether Becky is a bona fide purchaser for purposes of Maine's Recording Act.

Bona Fide Purchaser Status

Under the Maine Recording Act, 33 M.R.S. § 201, "[c]onveyances of the right, title or interest of the grantor, if duly recorded, shall be as effectual against prior unrecorded conveyances, as if they purported to convey an actual title." However, the protection of the Recording Act is limited to bona fide purchasers. *Haden v. Russell*, 119 Me. 38, 39-40, 109 A. 485, 485-86 (1920); *Veneziano v. Spickler*, SAG-RE-07-006 (Me. Sup. Ct. Jan. 6, 2009) (J. Horton), *aff'd on other grounds, Spickler v. Ginn*, 2012 ME 46, 40 A.3d 999; *see also Eastwood v. Shedd*, 166 Colo. 136, 138-39, 442 P.2d 423, 425 (1968) (summarizing the "bona fide purchaser" rule followed by a

---

[1] Becky also asserts claims for trespass and slander of title, and seeks a permanent injunction preventing further trespass on the Camp. These claims are all dependent on a finding for Becky on her first claim, that the Camp belongs to her. This Court finds that Becky does not hold any title to the Camp and as such Becky's other claims necessarily fail because she has no legal right to assert them. Lisa also asserts other claims, which will be addressed in due course.

8

majority of states). In order for Becky to qualify as a bona fide purchaser, (i) the 1977 Agreement must have been supported by consideration, and (ii) Becky must have lacked notice of the 2005 Deed to Lisa. *See Hanscom v. Bourne*, 133 Me. 304, 312, 177 A. 187, 190-91 (1935); 18-A M.R.S. § 2-203(3). Here, Becky is unable to satisfy either prong of the bona fide purchaser test.

   i.      *Consideration*

On remand the Law Court has provided explicit guidance on how to evaluate the presence or absence of consideration in this case. First, the relevant time period is 1977. *Belanger v. Yorke*, 2020 ME 24, ¶ 21, 226 A.3d 215 (citing Restatement (Second) of Contracts §§ 71, 86 & cmt. a (Am. Law Inst. 1981)).

> In other words, if in 1977 both [Becky] and Brad considered that [Becky's] transfer of the Prospect Street Property was "in exchange for" Brad's transfer of the Camp – whenever those transfers might take place – then Brad's 2016 deed to [Becky] was supported by consideration for purposes of the bona fide purchaser protections; [Becky] was not required to provide any additional consideration in 2016. Brad's intention in 2016 is therefore irrelevant except to the extent that it sheds any light on what his understanding was in 1977 . . . ."

*Id*. Mutual promises to convey property interests to one another may constitute sufficient consideration for purposes of determining whether someone is a bona fide purchaser. *Id.* ¶ 25 (quoting Restatement (Second) of Contracts § 75, cmt. a ("In modern times the enforcement of bargains is not limited to those partly completed, but is extended to the wholly executory exchange for promise.")). A performance or return promise must be bargained for to constitute consideration. *Id.* (citing Restatement (Second) of Contracts § 71(1)). A return promise is bargained for "if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." Restatement (Second) of Contracts § 71(2). Both parties' intentions, as objectively manifested, are relevant to the bargain. *Id.* § 71 cmt. b; *Laflamme v. Hoffman*, 148 Me. 444, 450-51, 95 A.2d 802 (1953). "Inducing the other person's promise need not be the primary or

substantial motive for the action constituting consideration (whether promise or performance); likewise, a promise induced by the promise constituting consideration need not be primarily motivated by it." *Belanger*, 2020 ME 24, ¶ 26 (internal citations omitted). "[L]ove and affection" can be the primary motivation for an agreement, e.g. to convey property, and the promises to convey that property will still constitute consideration so long as the promise was meant in some capacity, even secondary or tertiary, to induce a return promise. *Id.*

However, the parties' use of the word "agreement" does not resolve the question. *Id.* ¶ 31. The word "agreement" does not imply, by itself, that both promises are supported by consideration. *Id.* The question remains whether Brad and Becky's "mutual promises were either a quid pro quo (and thus consideration for each other) or a matter of marital obligation or perceived social propriety (and thus not consideration)."

> Thus, two facts must be found to be true in order for Brad's 2016 deed to [Becky] to have been supported by consideration: (1) [Becky] must have made her 1977 promise or her 1978 conveyance in exchange for Brad's promise to convey his property, and (2) Brad must have intended for his reciprocal 1977 promise to convey his property to induce [Becky]'s promise to convey hers." Brad's intent at that time may be discerned by evidence of his statements and actions in 1977 as well as his actions related to that alleged promise thereafter. If either Brad or [Becky] viewed the 1977 agreement exclusively as a mutual exchange of gifts, rather than as "bargained-for" exchange (at least in part), then neither [Becky's] promise to convey her property nor her performance of that promise in 1978 can constitute consideration for purposes of rendering her a bona fide purchaser of Brad's property.

*Id.* ¶ 27. There is no *per se* rule for establishing a presumption of a bargained-for exchange, as opposed to a gift, in reciprocal property transfers in the context of marriage, family relationships, and friendships, where "the motives behind a mutual exchange are more complex and more difficult to determine" than in an arms-length business transaction. *Id.* ¶ 28.

Here, neither Becky's 1977 promise nor her 1978 deed was in exchange for Brad's promise to convey the Camp to her. The exclusive purpose behind Becky's actions in 1977 and 1978 was

10

to provide a gift to her new husband and to help solidify their marital relations, and this is not consideration. She testified in her deposition that her 1978 transfer of the Prospect Street Property "made a couple" and that she "didn't gain anything . . . when [she] put his name on [her] house, and he didn't gain anything when he put [her] name on his cottage" in 2016. Ultimately, her promise and deed were not connected to Brad's deeding of the Camp. There was no trace of quid pro quo whatsoever. This is amply demonstrated by the total lack of action on the point by Becky in the many years following her transfer to Brad. She did not insist he reciprocate when they made the original 1977 Agreement, she did not insist he reciprocate when she actually transferred the Prospect Street Property in 1978, and she did not insist he reciprocate when his parents died in 1984 and in 1989. Becky let the matter drop entirely—it simply was of no concern to her.

Likewise, Brad did not make his promise to Becky in 1977 in exchange for her return promise. He entered the original 1977 Agreement, such as it was, to placate his new wife, knowing he had no intention and was under no obligation to follow through. His promise was inherently empty; his actions over the subsequent forty years prove that at no point—including in 1977—did he ever plan to transfer ownership of the Camp to Becky in any capacity, either in exchange for joint ownership of the Prospect Street Property or even simply out of love and affection. Over the course of four decades of marriage and up until the very day of his death, Brad never took any initiative to transfer the Camp to Becky. His 1978 assuagement that he would wait until after his mother and father's deaths to transfer the property was just that—assuagement. The pressure from his parents to keep the Camp in the family prevented him from entering a joint tenancy with Becky both during and after his parents' lifetimes. Even after signing the 2005 Deed into Lisa, thereby keeping the Camp in the family as he had always intended, Brad declined to confront Becky, preferring to avoid conflict over the matter.

11

Significantly, the 2005 Deed was drawn up and signed of Brad's own initiative, indicating it was the fulfillment of his intent. In contrast, the 2016 Deed was Becky's doing without any input from Brad. He had no pre-meeting with Voorhees about the transfer and never had the chance to consult independent counsel. Becky hired the lawyer, Becky arranged the meetings, and Becky placed a stack of finalized estate planning documents in front of Brad to sign. He was unaware of the existence of the 2016 Deed until it was on the table before him and a pen had been placed in his hand. At that moment, weeks away from his death, Brad again chose to avoid confrontation and signed the futile deed.

As discussed, that their mutual promises in 1977 are now termed an agreement "does not resolve the question." *Belanger*, 2020 ME 24, ¶ 31. "In this context . . . the word 'agreement' does not imply, by itself, that both promises are supported by consideration . . . . [T]here exist some 'agreements which are not contracts, such as transactions where one party makes a promise and the other gives something in exchange which is not consideration.'" *Id.* (quoting Restatement (Second) of Contracts § 3 cmts. a, c). In many exchanges of presents or favors between spouses or friends, even where there is an "agreement" to make the exchange, "there is no element, even minor, of quid pro quo or bargain." *Id.* Such is the case here. At no point did Becky mention the 1977 Agreement to anyone, including her own lawyer, before or during estate planning. Only after Becky had commenced litigation forty years later did Brad and Becky's casual pact, founded on social propriety and domestic relations, begin to be referred to as a capitalized "Agreement." Brad and Becky's arrangement in 1977 was not a bargained-for exchange, has no more legal significance than a couple's practice of exchanging anniversary gifts, and does not constitute consideration for purposes of Maine's Recording Act.

ii.     *Notice*

12

Becky also fails the Recording Act's requirement that she not have actual notice of the prior transfer into Lisa. 33 M.R.S. § 201 ("No conveyance of an estate in fee simple. . . is effectual against any person except the grantor, his heirs and devisees, and persons having actual notice thereof unless the deed or lease is acknowledged and recorded in the registry of deeds.") Actual notice is not synonymous with actual knowledge; actual notice may be implied when "one who is put on a trail is in duty bound to seek to know, even though the track or scent lead to knowledge of unpleasant and unwelcome facts." *Gagner v. Kittery Water Dist.*, 383 A.2d 206, 207 (Me. 1978) (quoting *Hopkins v. McCarthy*, 121 Me. 27, 29, 115 A. 513, 515 (1921)). Though Lisa did not record the 2005 Deed, she and Michael did not keep their ownership secret. They made extensive use of the Camp and made substantial, visible repairs to the property. Becky saw their work and knew of their control over the Camp. They told essentially everyone except Becky (directly) about the transfer. However, Becky's son Matthew conveyed to Becky the comments Michael made about Lisa owning the Camp. Given the evident nature of Lisa and Michael's use of the Camp, the widespread knowledge that Lisa held title from 2005, and her son's questioning, Becky was on implied actual notice that the Camp's title had been transferred to Lisa.

For both of these reasons—lack of consideration and notice—Becky is not a bona fide purchaser of the Camp, and the recording of the 2016 Deed is not entitled to the protection of the Recording Act. Lisa has the right, title and interest in the Camp. Declaratory judgment for ownership of the Camp is entered in favor of Lisa and against Becky.

Undue Influence

The Improvident Transfers of Title Act, 33 M.R.S. § 1021 et seq., provides a rebuttable presumption of undue influence in any transfer of real estate for less than full consideration by an elderly person who is dependent on others to a person with whom the elderly person has a

confidential or fiduciary relationship unless said elderly person was represented by independent counsel. "Dependent" means wholly or partially and emotionally or physically dependent on another for care or support and "elderly" means 60 years of age or older. 33 M.R.S. § 1021. Only the elderly dependent person, his or her legal representative, or the personal representative of a decedent's estate has standing to bring a claim under this Act. *Id.* § 1023(1); *Estate of Anne C. Conman v. Straus*, No. CV-97-637, 1999 Me. Super. LEXIS 232 at *2 (Me. Super. Ct. August 18, 1999) (holding that relatives and prospective heirs of elderly person have no standing to sue under Improvident Transfer Act); *cf. Estate of Miller*, 2008 ME 176, ¶ 25 n.5, 960 A.2d 1140 (noting that Maine Legislature in 2003 expanded standing to personal representative of decedent's estate).

But for the standing issue, the circumstances of the transfer of the Camp by Brad into joint tenancy with Becky would fall under the Improvident Transfers of Title Act. Brad was 82 years old at the time he signed the 2016 Deed. He was wholly dependent on Becky due to his age and illness. He had a confidential and fiduciary relationship with Becky as his wife and caregiver. He transferred title in real estate to her for, as discussed above, zero consideration, and was categorically not represented by independent counsel. The sole reason Becky escapes the burden of proof imposed by the Act is that Lisa, as a devisee, lacks standing to press this statutory claim. *See* 33 M.R.S. § 1023(1); *Estate of Anne C. Conman*, 1999 Me. Super. LEXIS 232 at *2.

However, heirs or devisees may still bring a common law claim of undue influence. *Estate of Sylvester v. Benjamin*, 2001 ME 48, ¶ 18, 767 A.2d 297, *superseded by statute on other grounds*, 33 M.R.S. § 1023(1). Common law undue influence claims seek to avoid transfers which were the product of such influence. *Ruebsamen v. Maddocks*, 340 A.2d 31, 34-38 (Me. 1975), *superseded on other grounds*, Me. R. Evid. 301. Undue influence exists where there is "unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the

14

relation[ship] between them is justified in assuming that that person will not act in a manner inconsistent with his welfare." *Theriault v. Burnham*, 2010 ME 82, ¶ 6, 2 A.3d 324 (quoting *DesMarais v. Desjardins*, 664 A.2d 840, 843 (Me. 1995)). Undue influence "may be presumed if the plaintiff shows by a preponderance of the evidence that a confidential relationship existed between the defendant and the decedent." *Id.*; *Ruebsamen*, 340 A.2d at 34, 36-37. A confidential relationship exists where one individual "placed trust and confidence in the [accused party] and there was a great disparity of position and influence in the relationship." *Theriault*, 2010 ME at ¶ 6.

The evidence produced at trial supports a finding that Becky abused her confidential relationship with Brad and exerted undue influence over him, meaning that even aside from the question of Becky's bona fide purchaser status, the transfer in the 2016 Deed must be avoided. Becky, as caretaker, was in complete control of Brad in the last two years of his life. She was his wife of forty years and Brad was fully justified in believing she would act in his best interests, meaning she and Brad were in a confidential relationship. Brad had little choice but to place his trust and confidence in Becky both to manage his day-to-day affairs and to arrange his estate. Becky's influence was particularly strong in the estate-planning sphere, as she is the one who had a personal connection to their attorney, Voorhees, and she is the only one who ever spoke with him individually. In effect, she was the only spouse represented by counsel. Becky, with Voorhees' aid, made all the decisions regarding the finalizing of her and Brad's estate, including the decision to transfer Brad's family Camp to herself. This self-serving transfer was carried out by virtue of Becky's dominion over her ailing husband and is a picture of common law undue influence by abuse of a confidential relationship.

<u>CONCLUSION</u>

For all the reasons stated above, judgment is granted in favor of Defendant Lisa Yorke on all Counts of the Complaint, and on Counts I and II of the Counterclaim. Count III of the Counterclaim is denied as moot. There were real disputes as to all issues, the litigation was handled responsibly by both sides, and thus the Court declines to award attorney's fees to either party. Each party is responsible for its own costs.

SO ORDERED.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this order by reference on the docket for this case.

Dated: **11/18/2021**

_____
Michael A. Duddy
Judge, Business and Consumer Court

Entered on the docket: 11/19/2021

16

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER DOCKET
LOCATION: PORTLAND
DOCKET NO. BCD-CV-17-56 ✓

REBECCA W. BELANGER,           )
                               )
          Plaintiff,           )
                               )     JUDGMENT ON A STIPULATED
                               )     RECORD IN FAVOR OF
v.                             )     DEFENDANT LISA M. YORKE
                               )
LISA M. YORKE,                 )
                               )
          Defendant            )

The parties seek the Court's determination of whether Plaintiff's 2016 deed
was supported by consideration. The parties have represented that resolution of this
discreet issue may lead to a resolution of the case. For the reasons discussed below,
the Court concludes that Plaintiff's 2016 deed was not supported by consideration,
and thus Plaintiff was not a bona fide purchaser for purposes of Maine's Recording
Act. The Court renders judgment in favor of Defendant on the consideration issue.[1]

## FACTS

The parties have agreed to a Stipulated Statement of Facts ("SSF") upon which
they ask the Court to decide the consideration issue. The SSF consists of thirty-one
numbered paragraphs and nine exhibits. The SSF along with its exhibits constitute
the stipulated record. Based upon the stipulated record, and drawing all reasonable
inferences therefrom, the Court finds as follows:

---

[1] The parties spar over who has the burden of proof. The Court assumes, without deciding, that the
party raising lack of bona fide purchaser status has the burden of proof on that issue. Defendant is the
party raising the issue, and the Court finds she has satisfied her burden of proof.

1

In 1976, Bradford P. Belanger, Jr. ("Brad") received from his parents the deed to a camp located on 22 Bruce Byway in West Bath, Maine (the "Camp"). In 1977, Brad married Rebecca Williams ("Becky"). It was Brad's second marriage. Becky owned property on Prospect Street in Bath, Maine (the "Prospect Street Property"). In 1977, soon after their marriage, Becky and Brad made an agreement to put each other's names on their separately owned properties as joint tenants. In 1978, Becky conveyed her Prospect Street Property to herself and Brad as joint tenants. In conjunction with the deed filed in the Registry of Deeds, Becky and Brad signed (under penalties for false declaration of value) and filed a Real Estate Transfer Tax Declaration ("RETTD"). The RETTD was prepared by an attorney representing Becky and Brad. Section 8 of the RETTD is entitled "Consideration," and requires the parties disclose the amount of the consideration for the transfer. The instructions for Section 8 are shown on the RETTD form, and state in relevant part as follows: "Consideration meaning the total amount or price paid, or required to be paid, for real property valued in money, whether received in money or otherwise . . . ." The amount of the consideration Becky and Brad disclosed in Section 8 was $0.00.[2]

Brad, however, did not simultaneously convey the Camp to Becky and himself as joint tenants, despite the agreement struck the year before, and despite Becky adding Brad to the Prospect Street Property deed as a joint tenant. Because Brad had received the Camp as a gift from his parents, he was concerned his parents would be

---

[2] Section 10 of the RETTD is entitled "Special Circumstances." It asks: "Were there special circumstances in the transfer which suggest that the sale price of the property was either more or less than its fair market value (Such as the fact that transfer was a forced sale, interfamily sale, intercorporate sale, gift, exchange, etc.)." The box for "No" is crossed out, and the box for "Yes" is checked. Becky and Brad provided no clarifying explanation in the space provided for Section 10.

2

upset if he added Becky to the Camp deed. Accordingly, Brad suggested to Becky, and Becky agreed, that the transfer of the Camp into joint tenancy with Becky would be delayed until after the death of Brad's parents.

Brad's father died in 1984 and his mother died in 1989. Brad, however, did not contemporaneously transfer the Camp into joint tenancy with Becky and himself, despite the agreement reached in 1978.

Instead, many years later by deed dated June 5, 2005, Brad made a gift of the Camp to Lisa M. Yorke ("Lisa"), his daughter from his first marriage. In a letter accompanying the deed given to Lisa, Brad wrote in relevant part: "I have always wanted you to have this property and look forward to seeing you enjoy this property during my lifetime. I do acknowledge that I have mentioned this property in the latest version of my Will and left it to my dear wife, Rebecca, but I have always intended it to go to you for you and your family. I intend for this to be an immediate transfer of this property, whether you decide to record it or not." Lisa did not contemporaneously record her 2005 deed because she wanted to give Brad time to tell Becky about it in his own way. Neither Brad nor Lisa ever disclosed the existence of the 2005 deed to Becky.

In 2016, Becky and Brad met with an attorney for estate planning purposes. After performing title work in conjunction with the estate planning process, the attorney informed Brad and Becky that the Camp was not in joint ownership. The attorney suggested the Camp be put in joint tenancy with Brad and Becky as part of their updated estate plan.

3

On June 27, 2016, Brad delivered a deed of the Camp to Becky and himself as joint tenants. On June 29, 2016, the deed was recorded in the Registry of Deeds. In conjunction with the deed filed in the Registry of Deeds, Becky and Brad signed (under penalties for false declaration of value) and filed a RETTD. The RETTD form was prepared by an attorney representing Becky and Brad. Section 6 of the RETTD is entitled "Transfer Tax" and requires the parties to disclose the purchase price for the transfer. Section 6a) is plainly visible on the form and states: "Purchase Price (If the transfer is a gift, enter "0"). The purchase price listed on the RETTD signed by Brad and Becky was 0.00.[3]

On July 15, 2016, Lisa recorded her 2005 deed in the Registry of Deeds (along with the letter from Brad). On August 21, 2016, Brad died. Lisa had no notice or knowledge of the 1977 agreement between Becky and Brad until after Brad died. At a deposition in 2017, in response to a line of questions about the Camp, Becky testified: "I have a deed that Brad gifted to me."

## DISCUSSION

The Maine Recording Act provides, in pertinent part, that "[c]onveyances of the right, title or interest of the grantor, if duly recorded, shall be as effectual against prior unrecorded conveyances, as if they purported to convey an actual title." 33 M.R.S. § 201. The protection of the Recording Act, however, is limited to bona fide purchasers. *Hayden v. Russell*, 119 Me. 38, 39-40, 109 A. 485, 485-86 (1920);

---

[3] Section 9 of the RETTD is entitled "Special Circumstances." It asks: "Were there any special circumstances in the transfer which suggest the price paid was either more or less than its fair market value? If yes, check the box and explain." The box was not checked. However, in the space proved for explanation, the following information is provided: "Transfer of property to husband and wife as joint tenants."

4

*Veneziano et. al. v. Spickler*, SAG-RE-07-006 (Me. Sup. Ct. Jan. 6, 2009, J. Horton), *aff'd on other grounds Spickler v. Ginn*, 2012 ME 46, 40 A.3d 999; *see also Eastwood v. Shedd*, 166 Colo. 136, 138-39, 442 P.2d 423, 425 (1968) (summarizing the majority rule followed by most states). The general question presented in this case is whether Becky is a bona fide purchaser for purposes of the Recording Act. Unless she is a bona fide purchaser, her 2016 deed—although recorded before Lisa's 2005 deed—is not entitled to the protection of the Recording Act.

There are two prongs to the bona fide purchaser analysis: consideration, and lack of notice. *Hanscom v. Bourne*, 133 Me. 304, 312, 177 A. 187, 190-91 (1935); *see also* 18-A M.R.S. § 2-202(3)(in the context of estates). In the Court's Combined Order on Cross-Motions for Partial Summary Judgment (November 1, 2018), the Court found there is a genuine factual dispute as to whether Becky had implied actual notice of Lisa's deed. Hence, the parties have framed the current question purely as one of consideration, because without consideration the disputed issue of notice is moot. Accordingly, the Court constrains its determination to the consideration prong of the bona fide purchaser analysis.

With regard to consideration, "[a] bona fide purchaser is one who at the time of [her] purchase advances a new consideration, surrenders some security, or does some other act which leaves [her] in a worse position if [her] purchase should be set aside . . . ." *Cadwallader v. Clifton R. Shaw, Inc.*, 127 Me. 172, 179 142 A. 580, 583 (1928). In order to constitute a bona fide purchaser as to prior claims of title, "there must be a new consideration moving between the parties . . . ." *Hayden*, 119 Me. at 39; 109 A. at 485. The specific question, therefore, is whether at the time of Becky's

5

"purchase," the consideration necessary for Becky to claim bona fide purchaser status was moving between the parties.

Becky acquired the deed to the Camp as a joint tenant on June 27, 2016 (and recorded the deed on June 29, 2016). At that time, Becky did not advance any new consideration, surrender any security, or perform any other act which left her in a worse position if her acquisition should be set aside. Line 6a) of the 2016 RETTD, prepared by an attorney representing Becky and Brad and signed by Becky and Brad under penalty for false declaration of value, and filed in the Registry of Deeds with the 2016 deed, shows the purchase price was $0.00. According to the plainly visible instructions on the RETTD, an entry of $0.00 on Line 6a) indicates the transfer was a gift. *See* 36 M.R.S. § 4641(1) & (3) (definitions of consideration and value). Although a lawyer prepared the RETTD for Becky and Brad, the lawyer was acting as agent for Becky and Brad, the legal responsibility for the declaration lay with Becky and Brad, and Becky and Brad signed the RETTD under penalty for false declaration. The concept involved—that $0.00 means the transfer is a gift—is not beyond the grasp of parties signing an RETTD prepared by their lawyer, and the Court is unwilling to treat their RETTD declaration as unknowing.[4] Further, consistent with the 2016 RETTD, Becky testified at her 2017 deposition that Brad gifted the Camp deed to her in 2016.

---

[4] Moreover, Becky enjoys a substantive benefit for her representation that the transfer was not for value. A tax is generally imposed on each deed by which any real property is transferred, calculated with reference to the value of the property transferred. 36 M.R.S. § 4641-A(1)(A). However, Becky was not required to pay transfer tax on the transaction when she recorded the deed in the Registry of Deeds based on her representation in the RETTD because "[d]eeds between husband and wife . . . without actual consideration for the deed" are exempted from the transfer tax. *Id.* § 4641-C(4). It would be inequitable and illogical to allow Becky to maintain that there was no consideration for the transfer for purposes of avoiding a tax liability but that there was consideration for purposes of enjoying the protection of Maine's recording statute, 33 M.R.S. § 201.

6

Based on the evidence, the Court finds Brad's 2016 conveyance of the Camp to Becky as a joint tenant was a gift. Accordingly, Becky's 2016 acquisition of the deed to the Camp as a joint tenant was not accompanied by new consideration, and Becky was not a bona fide purchaser.

Becky objects, arguing that the consideration for the 2016 Deed was the 1977 exchange of promises to put each other's names on their separately owned real estate. The problem with that argument, however, is that the 1977 agreement was replaced by, or amended by, the 1978 agreement. In 1978, Becky transferred her Prospect Street Property into joint tenancy with Brad, but Brad did not transfer the Camp into joint tenancy with Becky.[5] Instead, Brad suggested to Becky, and Becky agreed, that the transfer of the Camp into joint tenancy with Becky would be delayed until after the death of Brad's parents. There was, therefore, no longer an exchange of promises. All that remained was Brad's verbal promise to make Becky a gift of land at some indefinite time in the future, and that promise was not accompanied by any new consideration.[6] Certainly, that promise did not constitute new consideration for the 2016 transfer of the Camp to Becky as a joint tenant.

---

[5] The 1978 RETTD Becky and Brad signed in connection with transferring the Prospect Street Property into joint tenancy indicates the amount of consideration for the conveyance was $0.00, thus indicating the transfer was a gift. The gift intent evidenced by the 1978 RETTD is consistent with the fact that despite the 1977 agreement, Becky did not wait for Brad to convey the Camp into joint tenancy, but instead went right ahead and conveyed the Prospect Street Property into joint tenancy with nothing other than a vague promise with no timeframe. The Court finds that Becky's 1978 conveyance of the Prospect Street Property to Brad as a joint tenant was a gift, unsupported by any consideration.

[6] The promise was also unenforceable, for two reasons. First, there is no evidence that as the donee, Becky made any significant improvements to the property in reliance on the promise. *See Siciliani v. Connolly*, 651 A.2d 386, 387 (Me. 1994). Second, the promise was unenforceable due to the statute of frauds, 33 M.R.S. § 51(4)&(5)(writing required for contracts for the sale of land and contracts not to be performed within one year).

7

Becky also argues the 2016 deed was supported by various other forms of consideration, such as ownership interest in a Mercedes Benz and an IRA savings account. But these items were not declared on the RETTD as consideration for the deed, and as a matter of fact these items were not exchanged as a quid pro quo for the 2016 deed. The fact that the parties engaged in mutual estate planning also fails as consideration for the 2016 deed. Becky did not cite any authority that would support her novel theory of consideration. The authority cited in Becky's prior motion for partial summary judgment does not support such a conclusion. *Spooner v. Spooner*, 2004 ME 69, 850 A.2d 354 simply stands for the now-familiar proposition "that when real estate is held in joint tenancy there is a presumption that it is martial." *Id.* ¶ 18. *Reville v. Reville*, 370 A.2d 249 (Me. 1977) recognizes the State's "policy interest in maintaining the integrity of the marriage relation." *Id.* at 252. Neither of these principles necessarily leads to the conclusion that mutual estate planning is consideration for either party's participation in such an exercise. Further, mutual estate planning was not declared on the RETTD as consideration for the 2016 deed.

As a result, judgment on the consideration issue is entered in favor of Defendant Lisa M. Yorke.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Judgment by reference on the docket for this case.

So Ordered.

March 7, 2019.

Michael A. Duddy
Judge, Business and Consumer Docket

8

STATE OF MAINE                          BUSINESS & COUNSUMER DOCKET
CUMBERLAND, ss.                         DOCKET NO. BCD-CV-17-56✓


REBECCA WILLIAMS BELANGER,        )
                                  )
        Plaintiff,                )
                                  )
v.                                )        COMBINED ORDER ON CROSS-
                                  )        MOTIONS FOR PARTIAL SUMMARY
LISA M. YORKE,                    )        JUDGMENT
                                  )
        Defendant.                )


Before the Court is Plaintiff Rebecca Williams Belanger's motion for partial summary

judgment and Defendant Lisa M. Yorke's (as Counterclaim-Plaintiff) motion for partial summary

judgment. The Court heard oral argument on the motion on August 31, 2018. Christopher Pazar, Esq.

appeared for Ms. Belanger and Ms. Yorke was represented by William Childs, Esq.

## FACTS

This is a case about a piece of real property that a man inherited from his parents and seems to

have conveyed to both his wife and his daughter (his wife's stepdaughter) at different times during his

life. That man has since passed away. Both women now claim exclusive title to the property, and have

sued each other for, inter alia, a declaratory judgment to that effect.

On October 9, 1976, Bradford P. Belanger, Sr. and Dorothy C. Belanger conveyed property

located in West Bath, Maine to Bradford P. Belanger, Jr. ("Brad") by virtue of a warranty deed

recorded at the Sagadahoc County Registry of Deeds (the "Registry") at Book 446, Page 182. (Pl's

Supp'g S.M.F. ¶ 1; Def's Supp'g S.M.F. ¶ 3.) The Property is located at 22 Bruce Byway and contains

a cottage (the "Cottage"). (Pl's Supp'g S.M.F. ¶ 3.) Brad passed away on August 21, 2016 at the age

of eighty-two following a kidney cancer diagnosis seven years prior in 2009. (Pl's Supp'g S.M.F. ¶¶

1

4-5; Def's Supp'g S.M.F. ¶ 90.) Brad was survived by his wife of thirty-nine years, Rebecca Williams Belanger ("Ms. Belanger") as well as his three adult children. (Pl's Supp'g S.M.F. ¶¶ 6-8, Def's Supp'g S.M.F. ¶ 4.) One of those children is Defendant Lisa M. Yorke, a child from his first marriage. (Pl's Supp'g S.M.F. ¶ 8, Def's Supp'g S.M.F. ¶ 5.) The other two adult children are the children of Brad and Ms. Belanger. (Pl's Supp'g S.M.F. ¶ 7.)

Before 2016, Brad had executed two wills, one in 1985 and one in 1999, neither of which made any provision for Ms. Yorke; the former having alluded to "having otherwise provided for her." (Def's Supp'g S.M.F. ¶¶ 8-11.) In the spring of 2016, Ms. Belanger called John Voorhees, Esq. and subsequently she and Brad retained Mr. Voorhees to update their wills and obtain a financial power of attorney for Ms. Belanger over Brad. (Pl's Supp'g S.M.F. ¶¶ 22-23.) Thereafter, the two met with Mr. Voorhees on two occasions jointly, and Brad met with Mr. Voorhees alone on at least one occasion thereafter to sign the financial power of attorney. (Pl's Supp'g S.M.F. ¶¶ 24-25.)

Pursuant to an online title search performed in the course of his work for Brad and Ms. Belanger, Mr. Voorhees discovered that although Ms. Belanger had indicated in a questionnaire that the Property was held jointly by her and Brad, it was in fact held by Brad alone. (Pl's Supp'g S.M.F. ¶¶ 26-29.) The upshot of this discovery, and a subsequent meeting between Mr. Voorhees and both clients on June 27, 2016, was that Brad executed a warranty deed that purportedly grants the Property to himself and Ms. Belanger as joint tenants (the "Ms. Belanger Deed").[1] (Pl's Supp'g S.M.F. ¶ 21; *see* Pl's Supp'g S.M.F. ¶¶ 30, 32-33, 35-40.) The Ms. Belanger Deed was recorded on June 29, 2016. (Pl's Supp'g S.M.F. ¶ 40.) Ms. Yorke does not dispute this. However, she does dispute Ms. Belanger's assertion that Brad was mentally clear during the meeting when the deed was executed. (Pl's Supp'g

---

[1] Ms. Yorke does not necessarily dispute that the Ms. Belanger Deed was executed, but challenges the legal effect of that deed. (Def's Opp'g S.M.F. ¶ 21.)

2

S.M.F. ¶¶ 41-42; Def's Opp'g S.M.F. ¶¶ 41-42.) Mr. Voorhees and Ms. Belanger both testified at their depositions that Brad never said anything to them about a prior conveyance of the Property to Ms. Yorke. (Pl's Supp'g S.M.F. ¶¶ 46, 48.)

In fact, Brad had executed a deed releasing certain "land in West Bath, County of Sagadahoc, State of Maine" to Ms. Yorke over a decade prior on June 20, 2005 (the "Yorke Deed"). (Pl's Supp'g S.M.F. ¶¶ 49, 52-53.) The only real estate owned by Brad meeting that description at that time was the Property. (Def's Supp'g S.M.F. ¶ 14.) The Yorke Deed was accompanied by a letter from Brad to Ms. Yorke stating that he "always wanted you [Ms. Yorke] to have this property and look forward to seeing you enjoy this property" and that he "always intended for [the Property] to go to you for you and your family." (Def's Supp'g S.M.F. ¶¶ 18-20.) The Yorke Deed was recorded on July 15, 2016, over ten years after it was executed and sixteen days after the Ms. Belanger Deed was recorded. The Yorke Deed states that the property to be conveyed is "more particularly described as follows: See Exhibit A Hereto Attached"; however, there is no document identified as Exhibit A attached to the Yorke Deed as recorded. (Pl's Supp'g S.M.F. ¶¶ 50, 53-54.) Exhibit A has since been identified and there is no dispute that the Yorke Deed attached Exhibit A when it was executed in 2005. (Def's Supp'g S.M.F. ¶ 17.) There is no dispute that the Yorke Deed was a gift to Ms. Yorke exchanged for one dollar nominal consideration. (Pl's Supp'g S.M.F. ¶¶ 58-59.)

Ms. Yorke's decision to record the Yorke Deed was precipitated by an uncomfortable encounter on July 2, 2016, when Ms. Belanger and two of her cousins came to the Property, looked around the Cottage, and asked Ms. Yorke when she was leaving. (Pl's Supp'g S.M.F. ¶¶ 83-84; Def's Supp'g S.M.F. ¶ 54.) This was unusual because Ms. Belanger did not generally visit the Property and her behavior seemed strange to Ms. Yorke. (Pl's Supp'g S.M.F. ¶ 85; Def's Supp'g S.M.F. ¶ 55.) When

3

Ms. Yorke related this visit to her husband, he conducted an online title search and found the Ms. Belanger Deed recorded for the Property. (Pl's Supp'g S.M.F. ¶ 87; Def's Supp'g S.M.F. ¶ 56.)

After learning about the Ms. Belanger Deed, Ms. Yorke asked Brad about it in person in July 2016. (Pl's Supp'g S.M.F. ¶¶ 92, 94; Def's Supp'g S.M.F. ¶ 75.) Ms. Yorke testified that Brad told her he thought he was just signing a will and had no idea that he had signed the Ms. Belanger Deed. (Pl's Supp'g S.M.F. ¶ 92; Def's Supp'g S.M.F. ¶ 77.) Ms. Yorke further testified that Brad told her to go to a lawyer to get the Ms. Belanger Deed rescinded; instead, Ms. Yorke's husband decided to conduct his own online legal research in order to determine whether he and Ms. Yorke could rescind the Ms. Belanger Deed themselves without involving an attorney. (Pl's Supp'g S.M.F. ¶ 96; Def's Supp'g S.M.F. ¶ 78.) Based on Mr. Yorke's research, Ms. Yorke handwrote the following statement (the "Statement"), putatively on Brad's behalf:

> I Bradford P Belanger Jr wish to rescind[] Deed 2016R-04333 signed on 06/27/2016 and recorded on 06/29/2016. This deed was signed by me under undue influence as it was presented to me as part of my revised will and was not explained to me exactly as to what I was signing.
>
> The only valid deed pertaining to this property in West Bath is that signed by me on 06/20/2005 transferring ownership to my daughter Lisa Yorke. This is my only inten[t]ion ever. I wish this letter to be recorded and enforced as an instrument to correct a fraudulent conveyance and my final act pertaining to my West Bath property.
>
> This letter is written by me of my own free will and sound mind.

(Pl's Supp'g S.M.F. ¶¶ 97, 99; Def's Supp'g S.M.F. ¶ 87.) Rather than have this statement reviewed by an attorney, Ms. Yorke again relied on her husband's online legal research, which this time concluded that the Statement was not necessary at all. (Def's Supp'g S.M.F. ¶¶ 79-80.) Brad purportedly asked Ms. Yorke about the Statement when she was driving him to a doctor's appointment sometime thereafter. (Def's Supp'g S.M.F. ¶ 81.) Ms. Yorke explained to Brad that based on her husband's online

4

legal research no statement was necessary but Brad apparently[2] insisted that he be allowed to sign the Statement and that they have it notarized. (Def's Supp'g S.M.F. ¶¶ 82-84.) Brad signed the Statement and they had the Statement stamped by a notary public on the way to Brad's doctor's appointment on August 15, 2016. (Def's Supp'g S.M.F. ¶¶ 84-86.) Ms. Yorke recorded the Statement in the Registry on August 22, 2016. (Pl's Supp'g S.M.F. ¶¶ 107-109; Def's Supp'g S.M.F. ¶ 88.)

The parties dispute when and how Ms. Belanger became aware of Ms. Yorke's claimed interest in the Property. (Pl's Supp'g S.M.F. ¶ 60; Def's Opp'g S.M.F. ¶ 60.) However, it is undisputed that Ms. Yorke never told Ms. Belanger about the Yorke Deed, her recording of that deed, the Statement, her recording of the Statement, or any of her conversations with Brad about the two deeds or the Statement out of a desire to avoid confrontation and to protect her father from an uncomfortable situation with his wife. (Pl's Supp'g S.M.F. ¶¶ 88-90, 110-111.) Nonetheless, ultimately, she thought her father should be the one to tell Ms. Belanger about the Yorke Deed in his own way and in his own time. (Pl's Supp'g S.M.F. ¶¶ 62, 64; Def's Supp'g S.M.F. ¶¶ 26-28.) Ms. Yorke did not previously record the Yorke Deed for the same reasons and was waiting for him to tell her to record the deed. (Pl's Supp'g S.M.F. ¶¶ 63-66.) Toward the end of his life, Ms. Yorke believed that Brad was afraid of Ms. Belanger and that there was a power imbalance between them as Brad was sick with cancer and Ms. Belanger was his caregiver and medical decisionmaker. (Def's Supp'g S.M.F. ¶¶ 67-73.) Ms. Belanger says that had she found out about the Yorke Deed between 2005 and her husband's passing, her relationship with Brad would have been very different. (Pl's Supp'g S.M.F. ¶ 91.) She would have at least ensured that she was not contributing financially to the Property, and she would have modified the mutual estate plan she had established with Brad. (Pl's Supp'g S.M.F. ¶ 91.)

---

[2] Ms. Belanger disputes that this conversation actually took place. (Def's Opp'g S.M.F. ¶¶ 82, 84.)

5

There is no genuine dispute that Ms. Yorke and her family have used the Property more than Ms. Belanger or Brad, especially since Brad's father passed away in 1984. (Def's Opp'g S.M.F. ¶¶ 124-125.) Brad and Ms. Belanger rarely ever slept overnight at the Cottage, and never after 1984. (Pl's Supp'g S.M.F. ¶¶ 112-114, 126.) Their only use of the Property thereafter was occasional summer use of a boat that was stored there, and this use ended six or seven years ago. (Pl's Supp'g S.M.F. ¶¶ 119-121.) Ms. Belanger's children's use of the Property is disputed. (Pl's Supp'g S.M.F. ¶ 122; Def's Opp'g S.M.F. ¶ 122.) Ms. Yorke testified that after 2005, her father twice called her to ask permission for her stepsister to stay at the Cottage and that her stepbrother lived at the Cottage for a couple months in the fall one year. (Pl's Supp'g S.M.F. ¶¶ 127-128; Def's Supp'g S.M.F. ¶ 42.) On the other hand, Ms. Yorke and her family have used the Property as consistently as they could since the mid 1980s. (Pl's Supp'g S.M.F. ¶¶ 124-125.)

However, the parties do dispute whether and to what extent there has been a change in the extent or character of Ms. Yorke's use of the Property over the years, particularly since 2005. Ms. Belanger claims that she has maintained the Property by paying taxes, insurance, and the electricity bill; Ms. Yorke claims that she has paid taxes on the Property since 2006 and the electric bill since 2005 by making cash payments to Brad. (Pl's Supp'g S.M.F. ¶ 69-71, 74-75; Def's Opp'g S.M.F. ¶ 69; Def's Supp'g S.M.F. ¶¶ 45-47; Pl's Opp'g S.M.F. ¶¶ 45-47.) There is no dispute that Ms. Yorke has not paid for any insurance on the Property until very recently, never took a deduction for the real estate taxes she paid on the Property (through cash payments to Brad), and cannot recall ever having paid a road association bill for the Property. (Pl's Supp'g S.M.F. ¶¶ 76-78, 80, 82.) Ms. Yorke claims that to her knowledge no one has used the Property without her permission since 2005; Ms. Belanger responds that this is news to her. (Def's Supp'g S.M.F. ¶ 35; Pl's Opp'g S.M.F. ¶ 35.) Ms. Yorke and Mr. Yorke have lived at the Property over the summer since 2005 and Mr. Yorke has lived there year-round since

6

2015. (Def's Supp'g S.M.F. ¶¶ 36, 40.) The parties dispute how much time and money Ms. Yorke has invested in the Property; however, there is no genuine dispute that Ms. Yorke has been responsible for the maintenance of and improvements to the Property since 2005. (Def's Supp'g S.M.F. ¶¶ 48-52; Pl's Opp'g S.M.F. ¶¶ 48-51.) The extent of Ms. Belanger's knowledge of any of the above facts relevant to Ms. Yorke's exercise of dominion over the Property is disputed. (Pl's Opp'g S.M.F. ¶¶ 35, 37-39, 41.)

Ms. Belanger's motion requests summary judgment in her favor on Count I (declaratory judgment) and Count II (slander of title) of her Complaint and Count I (declaratory judgment) and Count II (undue influence/ abuse of a confidential relationship) of Ms. Yorke's Counterclaim. Ms. Yorke opposes Ms. Belanger's motion, and moves for summary judgment in her favor on Ms. Belanger's affirmative defenses—33 M.R.S. § 489, equitable estoppel, and latches—to Ms. Yorke's Counterclaim.

## STANDARD OF REVIEW

Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CityMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted). A genuine issue exists where the jury would be required to "choose between competing versions of the truth." *MP Assocs. v. Liberty*, 2001 ME 22, ¶ 12, 771 A.2d 1040.

## ANALYSIS

I.    The Yorke Deed Has An Adequate Description of the Property Being Conveyed

7

At the outset, Ms. Belanger challenges the sufficiency of the Yorke Deed itself, arguing that it lacks an adequate description of the property it purports to convey and therefore had no effect on the Property or any interest therein. Ms. Yorke responds that the property description in the Yorke Deed is adequate.

The Yorke Deed purports to convey certain "land in West Bath, County of Sagadahoc, State of Maine" to Ms. Yorke from Brad. The only real estate owned by Brad meeting that description at that time was the Property. The Yorke Deed states that the property to be conveyed is "more particularly described as follows: See Exhibit A Hereto Attached"; however, there was no document identified as Exhibit A attached to the Yorke Deed when it was recorded in the Registry. Exhibit A has since been identified and there is no dispute that Exhibit A was attached to the Yorke Deed when it was executed in 2005.

The Court concludes that the property description in the Yorke Deed is adequate. There is no dispute that the Yorke Deed at the time of its execution attached Exhibit A and that Exhibit A included an adequate description of the Property. Thus, Ms. Belanger's challenge is not to the property description in the Yorke Deed *per se*; it is in the Yorke Deed as recorded in July 2016. In other words, the Yorke Deed could not have failed to pass title to the Property to Ms. Yorke in 2005 on the grounds that the property description therein was not adequate.

Ms. Belanger's challenge to the property description of the Yorke Deed that was recorded in the Registry does not require much discussion. Ms. Belanger points out that had the Yorke Deed been recorded earlier in time than the Ms. Belanger Deed without attaching Exhibit A, it is doubtful that the Yorke Deed would have been sufficient to provide actual notice of the conveyance under Maine's recording statutes. *See* 33 M.R.S. § 201-A(2). Here, however, it is undisputed that the Ms. Belanger Deed was recorded before the Yorke Deed; Ms. Yorke must therefore rely on a different theory to

8

establish Ms. Belanger's actual notice of the prior conveyance in order to prevail under Maine's race-notice statute regardless of the adequacy of the property description in the Yorke Deed as recorded.

II.      There Is a Genuine Factual Dispute as to Whether Ms. Belanger Had Implied Actual Notice of the Yorke Deed

Ms. Belanger claims superior title pursuant to Maine's race-notice recording statute, 33 M.R.S. § 201:

> No conveyance of an estate in fee simple . . . is effectual against any person except the grantor, his heirs and devises, and persons having actual notice thereof unless the deed or lease is acknowledged and recorded in the registry of deeds within the county where the land lies . . . . Conveyances of the right, title or interest of the grantor, if duly recorded, shall be as effectual against prior unrecorded conveyances, as if they purported to convey an actual title. All recorded deeds, leases or other written instruments regarding real estate take precedence over unrecorded attachments and seizures.

Ms. Belanger makes the straightforward argument that she recorded the Ms. Belanger Deed before Ms. Yorke recorded the Yorke Deed and that she did not have actual notice of the Yorke Deed prior to recording the Ms. Belanger Deed. If these facts were undisputed, and were the only facts relevant to the application of the race-notice statute, then indeed there is no question that Ms. Belanger would hold title superior to that claimed by Ms. Yorke.

However, Ms. Yorke challenges the proposition that it is undisputed that Ms. Belanger lacked actual notice of the prior conveyance. Ms. Yorke points out that actual notice, as that term is used in the recording statute, is not synonymous with "actual *knowledge*," and that actual notice may be implied. *Gagner v. Kittery Water Dist.*, 385 A.2d 206, 207 (Me. 1978) (quoting *Hopkins v. McCarthy*, 121 Me. 27, 29, 115 A. 513, 515 (1921)) ("Implied actual notice is that which one who is put on a trail is in duty bound to seek to know, even though the track or scent lead to knowledge of

9

unpleasant and unwelcome facts.") In *Gagner*, the Law Court elaborated by quoting nineteenth-century precedent:

> The doctrine of actual notice implied by circumstances . . . involves the rule that a purchaser before buying, should clear up the doubts which apparently hang upon the title, by making due inquiry and investigation. If a party has knowledge of such facts as would lead a fair and prudent man, using ordinary caution, to make further inquiries, and he avoids the inquiry, he is chargeable with notice of the facts which by ordinary diligence he would have ascertained . . . . It may be well concluded that he is avoiding notice of that which he in reality believes or knows. Actual notice of facts which, to the mind of a prudent man, indicate notice is proof of notice.

*Id.*, 385 A.2d at 207-08 (quoting *Knapp v. Bailey*, 79 Me. 195, 204, 9 A. 122, 124 (1887)). Whether the facts of which the transferee has actual knowledge would lead a reasonable person to make further inquiries, and thus whether that person has implied actual notice, is a factual determination. *See id.* Where a party has actual implied notice, she has a duty to inquire further. *Id.* at 208. What level of inquiry is sufficient to satisfy that duty is likewise a question of fact. *Id.* at 209. If the party fails to inquire further, she may be charged with "actual knowledge" of the facts she could have reasonably ascertained through such inquiry. *Gagner*, 385 A.2d at 207.

It would be error for the Court to find on this record that Ms. Belanger had "no notice, actual or implied, of the existence of the [Yorke Deed]." *See id.* at 208. There is a genuine dispute on that point. The record before the Court could support the following findings: that subsequent to Ms. Yorke's receipt of the Yorke Deed in 2005 and through the present, Ms. Yorke and her family have essentially been the exclusive users of the Cottage on the Property; that they have lived at the Property all summer, every summer since 2005; that Mr. Yorke has lived at the Property year-round since February 2015 and Ms. Yorke has stayed there with him three or four nights a week; that Brad asked

10

Ms. Yorke for permission for his other daughter to stay at the Property; and that Ms. Belanger herself felt that she needed an invitation from Ms. Yorke to visit the Property when she visited the abutting property. The record could also support the finding that Ms. Yorke and her family have been responsible for the maintenance of and improvements to the Property, including paying the bills, since 2005. Finally, the record could support the finding that Ms. Belanger had actual knowledge of some or all of these facts.

Ms. Belanger's argument is entirely factual and aimed at convincing the Court that (1) the evidence adduced by Ms. Yorke would not put a reasonable person on notice to inquire further about the ownership of the Property and (2) Ms. Belanger lacked actual knowledge of much of that evidence. These arguments may well prevail, but they must be made to the factfinder.[3]

Having concluded that the property description in the Yorke Deed was adequate to convey title, and that a genuine factual issue remains unresolved as to whether Ms. Belanger had implied actual notice of the Yorke Deed, summary judgment cannot be entered in Ms. Belanger's favor on Count I of her Complaint.

III.     Genuine Issues of Fact Preclude Summary Judgment Against Ms. Yorke on Ms. Belanger's Count for Slander of Title

Ms. Belanger has also moved for summary judgment on Count II of her Complaint, which alleges slander of title. Ms. Yorke responds that there are genuine factual issue which preclude granting summary judgment on this claim.

[T]o prove slander of title a claimant must prove (1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the

---

[3] Ms. Yorke's remaining arguments—that 33 M.R.S. § 201 only protects purchasers for value notwithstanding the statute's plain language and that Ms. Belanger is not protected by the statute as an "heir" notwithstanding the fact that Brad was alive when he executed the Ms. Belanger Deed—do not require further discussion; the genuine factual dispute of whether Ms. Belanger had implied actual notice of the Yorke Deed is a sufficient ground for denying summary judgment.

11

statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages.

*Harvey v. Furrow*, 2014 ME 149, ¶ 25, 107 A.3d 604 (quoting *Colquhoun v. Webber*, 684 A.2d 405, 409 (Me. 1996)). Ms. Belanger's claim is based on the Statement, which was recorded in the Registry, and states that Brad signed the Ms. Belanger Deed "under undue influence[.]" Ms. Belanger argues that the recording of the Statement, coupled with Ms. Yorke's deposition testimony with respect to her motivations and her understanding of "undue influence," satisfy all of the elements for slander of title. Ms. Yorke replies that the factual issues of whether the "undue influence" statement was false and whether it was made with malice or reckless disregard of its falsity remain disputed.

Ms. Yorke gets the better of this argument. As explained in more detail in Part VI below, Ms. Yorke clearly misapprehended the legal definition of undue influence; whether relying on her husband's online legal research and her father's purported explanation of the Ms. Belanger Deed is enough to escape liability for "reckless disregard" of her erroneous understanding may ultimately end up before the factfinder. *Cf. Pushard v. Bank of Am., N.A.*, 2017 ME 230, ¶ 17, 175 A.3d 103 (summary judgment appropriate where "there is nothing in the summary judgment record that could induce a fact-finder to determine" that defendant acted with malice or reckless disregard of the falsity of a slanderous statement). However, if Ms. Yorke prevails on her Counterclaim count for undue influence then it will be impossible for Ms. Belanger to prevail on this count in any event because the "undue influence" comment will not be false as a factual matter, notwithstanding Ms. Yorke's misapprehension of what constitutes undue influence. In sum, unresolved factual issues preclude granting summary judgment on Count II of Ms. Belanger's Complaint.

IV.    Section 480 of Title 33 of the Maine Revised Statutes Is Not A Defense to Ms. Yorke's Counterclaim Count for Declaratory Judgment

12

Ms. Belanger, as counterclaim-defendant, has raised 33 M.R.S. § 480 as an affirmative defense to Ms. Yorke's declaratory judgment counterclaim count; Ms. Yorke, as counterclaim-plaintiff, has moved for summary judgment on that affirmative defense. "If a plaintiff moves for summary judgment on an affirmative defense, the defendant opposing summary judgment must establish a prima facie case for each element of the affirmative defense in order to avoid summary judgment." *Sellars v. Osborne*, No. CV-14-133, 2015 Me. Super. LEXIS 149, *2-3 (Androscoggin Cty., August 25, 2015, *Kennedy, J.*) (citing *Reliance Nat'l Indemnity v. Knowles Indus. Servs.*, 2005 ME 29, ¶ 9, 868 A.2d 220). "The plaintiff is entitled to a summary judgment if the evidence presented by the defendant in support of its affirmative defense would, if produced at trial, fail to establish a prima facie case and entitle the plaintiff to a judgment as a matter of law." *Id.* at *3 (citing *Addy v. Jenkins, Inc.*, 2009 ME 46, ¶ 8, 969 A.2d 935).

Ms. Belanger argues that 33 M.R.S. § 480 required her signature on the Yorke Deed, and that because the Yorke Deed lacked her signature, she retains an interest in the Property as a nonowner spouse. That statute, in relevant part, provides as follows:

> An owner of real estate may convey that real estate, or any interest in it free from any claim to the real estate by his nonowner spouse . . . without signature of his nonowner spouse, unless:
>
> 1. Nonbona fide purchaser. The transfer requires signature pursuant to [18-A M.R.S. § 2-202 (1),(3)] . . . .
>
> After that conveyance, any claim of the nonowner spouse under . . . any . . . law[ ] shall be against the proceeds of that conveyance and not against the real estate.[4]

18-A M.R.S. § 2-202 (1),(3) provides, in relevant part:

---

[4] This selection and the ensuing discussion omit references to pending divorces, another condition requiring the signature of a nonowner spouse listed in subsection two of the statute, because that situation is irrelevant.

13

1. The value of property transferred to anyone other than a bona fide purchaser by the decedent at any time during the marriage, to or for the benefit of any person other than the surviving spouse, to the extent that the decedent did not receive adequate and full consideration in money or money's worth for the transfer, if the transfer is of any of the following types:

(i). Any transfer under which the decedent retained at the time of his death the possession of enjoyment of, or right to income from, the property . . . .

Any transfer is excluded if made with the written consent or joinder of the surviving spouse.

3. . . . a bona fide purchaser is a purchaser for value in good faith and without notice of any adverse claim.

Ms. Belanger argues that the nonowner spouse's claim is against the real estate itself if the transfer required her signature pursuant to 18-A M.R.S. § 2-202 (1),(3) and is only against the proceeds for any "other transfer" lacking the nonowner spouse's signature.[5] The Court rejects this proffered construction and concludes that the statute cannot operate as a "defense" to a competing claim of ownership. Assuming that Ms. Belanger were able to prove each element of the statute, at most she would be entitled to the proceeds of the challenged conveyance; in this case, one dollar. In other words, if Ms. Belanger were to prevail on her section 480 claim, it would have no effect on Ms. Yorke's claimed interest in the Property under the Yorke Deed and thus is not a defense to Ms. Yorke's declaratory judgment counterclaim count.

---

[5] Ms. Belanger implicitly acknowledges that this reading is not supported by the plain language of the statute but argues that the Court must interpret it this way in order to avoid an illogical result. *See Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 21, 107 A.3d 621. Our Legislature's intent may not be to Ms. Belanger's liking, but it is not absurd or illogical because it does not leave the nonowner spouse "without a remedy" when transfers are not for value. *See* 18-A M.R.S. § 2-207(c) (providing that in a proceeding for an elective share those who have received property that must be included in calculating the augmented state are subject to contribution orders by the Probate Court "to make up the elective share of the surviving spouse," thereby allowing the estate to "claw back" the value of such transferred property). Ms. Belanger was by no means required to choose her elective share rather than what she took under Brad's will, but her choice does not transmute section 480 into a mechanism by which conveyances can be invalidated for want of a signature of a nonowner spouse.

14

Section 480 requires the signature of a nonowner spouse on conveyances of real property by that person's spouse under certain circumstances, including where such signature would be required under 18-A M.R.S. § 2-202 (1),(3). It then plainly and unambiguously describes the nonowner spouse's recourse if that requirement is violated: her claim "shall be against the proceeds of that conveyance and *not against the real estate*." 33 M.R.S. § 480 (emphasis added). Simply put, section 480 by its own terms cannot support a competing claim of ownership to real property as against the transferee of a conveyance that violates the statute, let alone operate as an affirmative defense against the transferee's ownership claim. It can only support an independent claim by the nonowner spouse for the proceeds of the transfer.

Furthermore, even entertaining Ms. Belanger's construction for the sake of argument, she fails to satisfy the requirement that her signature was required under 18-A M.R.S. § 2-202(1) because there is no evidence that Brad "retained at the time of his death the possession of enjoyment of, or right to income from, the property." *See id.* There is a factual dispute regarding whether Brad retained some of the burdens of ownership of the Property, i.e. by paying taxes, insurance, and other bills; but there is no dispute that his use of the Property had effectively ended by 2005, and certainly by the time of his passing, and that he never derived any income from the Property.

The Court therefore concludes as a matter of law that 33 M.R.S. § 480 is not an affirmative defense to Ms. Yorke's ownership claim based on the Yorke Deed. Even if Ms. Belanger were to prove her signature was required on that deed pursuant to the statute, her claim would be against the proceeds of the conveyance and not the real estate. It would not invalidate the Yorke Deed or be a defense to Ms. Yorke's ownership claim based on the Yorke Deed. Ms. Yorke's request for partial summary judgment on Ms. Belanger's affirmative defense based on 33 M.R.S. § 480 is thus granted.

15

V.    Unresolved Factual Disputes Preclude Summary Judgment on Ms. Belanger's Other
      Affirmative Defenses

Ms. Yorke also moves for summary judgment on two of Ms. Belanger's other affirmative defenses to Ms. Yorke's Counterclaim—laches and equitable estoppel. "Laches is negligence or omission to seasonably assert a right. It exists when the omission to assert the right has continued for an unreasonable and unexplained lapse of time, and under circumstances where the delay has been prejudicial to an adverse party, and where it would be inequitable to enforce the right." *Brochu v. Macleod*, 2016 ME 146, ¶ 13, 148 A.3d 1220. "The doctrine of equitable estoppel bars the assertion of truth by one whose misleading conduct has induced another to act to his detriment in reliance on what is untrue." *Stickney v. City of Saco*, 2001 ME 69, ¶ 44, 770 A.2d 592.

At oral argument, the parties made clear what is implicit in the statements of material facts and responses thereto, and in each parties' written arguments on this aspect of the summary judgment motion: there are multiple, reasonable, and mutually exclusive explanations for Ms. Yorke's decision not to tell Ms. Belanger about the Yorke Deed; just as there are multiple, reasonable, and mutually exclusive explanations for why Brad seems to have transferred an interest in the Property to both his wife and his daughter at different times during his lifetime. Ms. Yorke's motivations must be determined by the factfinder at trial. The applicability of these defenses cannot be resolved on summary judgment.

VI.   A Genuine Issue of Material Fact Precludes Summary Judgment Against Ms. Yorke on
      Her Counterclaim Count for Undue Influence

Ms. Belanger has moved for summary judgment on Count II of Ms. Yorke's Counterclaim, which alleges undue influence on the part of Ms. Belanger in obtaining the Ms. Belanger Deed. Ms. Yorke responds that there are genuine issues of fact that preclude summary judgment on this count.

Undue influence is defined as the "unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relationship between them is justified in assuming that the person will not act in a manner inconsistent with his welfare." *Cote v. Cote*, 2016 ME 94, ¶ 14, 143 A.3d 117 (quotation omitted). "A presumption of undue influence arises if the plaintiff shows by a preponderance of the evidence that a confidential relationship existed between the defendant and the decedent." *Id.* (quotation omitted); *see also Estate of Gagnon*, 2016 ME 129, ¶ 10, 147 A.3d 356 ("Once the presumption is established, the burden shifts to the benefitted party to demonstrate affirmatively that he transacted with entire fairness and that the transaction was free of any undue influence affecting the other party's interests.") (quotation omitted). A confidential relationship exists where (1) "an individual place[s] trust and confidence in" another and (2) there is "great disparity of position and influence in the relationship." *Albert v. Albert*, 2015 ME 5, ¶ 8, 108 A.3d 388. The existence of a confidential relationship is a question of fact. *Cote*, 2016 ME 94, ¶ 14, 143 A.3d 117.

The parties' arguments on this count are entirely factual: Ms. Belanger claims that the "sole evidence" of undue influence is the Statement and she points out that it is undisputed that undue influence is referenced in the Statement based on Mr. Yorke's online legal research about how to rescind a deed, that Brad was competent when he executed the Ms. Belanger Deed, that Mr. Voorhees had no reason to suspect that Ms. Belanger was exerting undue influence over Brad, and that Ms. Belanger had no knowledge of the Yorke Deed—thereby obviating the necessity to exert undue influence over him in order to obtain the Ms. Belanger Deed. Ms. Yorke argues that the Statement is not the sole evidence of undue influence because there is considerable circumstantial evidence of a confidential relationship: she points out that it is undisputed that Ms. Belanger obtained a power of attorney over Brad on her initiative, and that she testified that Brad was afraid to upset Ms. Belanger

17

and did as Ms. Belanger told him because he depended on Ms. Belanger. It is undisputed that their relationship would have been "very different" if Brad had told Ms. Belanger about the Yorke Deed, lending credence to Ms. Yorke's description of Brad's trepidation toward Ms. Belanger.

The Court would be weighing the evidence if it rejected Ms. Yorke's circumstantial case in favor of Mr. Voorhees's recollection and Ms. Belanger's characterization of the Statement. Clearly, Ms. Yorke and Mr. Yorke misapprehended what actually constitutes undue influence when they elected to include that term in the Statement based on Mr. Yorke's online legal research, but this is not particularly relevant to whether a confidential relationship in fact existed between Ms. Belanger and Brad at the end of his life. Contrary to Ms. Belanger's argument, the Statement is not the only evidence of undue influence. The undisputed circumstances—at the very least, Brad's poor health and Ms. Belanger's holding of powers of attorney over Brad—could lead a reasonable factfinder to find that Ms. Belanger exercised a disparate amount of power and influence over Brad at the end of his life and that Brad had surrendered considerable trust and confidence to Ms. Belanger to make decisions on his behalf. Summary judgment cannot be entered when the genuine factual issue of whether a confidential relationship existed between Ms. Belanger and Brad at the time of the execution of the Ms. Belanger Deed remains unresolved.

## CONCLUSION

Based on the foregoing the entry will be:

Plaintiff Ms. Belanger's motion for partial summary judgment is DENIED.

Counterclaim-Plaintiff Lisa Yorke's motion for partial summary judgment on Counterclaim-Defendant Ms. Belanger's affirmative defenses is GRANTED in part and DENIED in

18

part. Ms. Yorke's motion is GRANTED as to Ms. Belanger's affirmative defense of 33 M.R.S. § 480. Ms. Yorke's motion is DENIED as to Plaintiff's affirmative defenses of equitable estoppel and laches.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: 11/1/18

Richard Mulhern
Judge, Business and Consumer Court

Entered on the Docket: 11-02-18
Copies sent via Mail ___ Electronically ✓

19